We'll hear argument first this morning in Case 12-536, McCutcheon v. Federal Election Comm'n. Ms. Murphy. Mr. Chief Justice, and may it please the Court, Bicker's aggregate contribution limits are an impermissible attempt to equalize the relative ability of individuals to participate in the political process. By prohibiting contributions that are within the modest base limits Congress has already imposed to combat the reality or appearance of corruption, these limits simply seek to prevent individuals from engaging in too much First Amendment activity. These limits cannot be justified on circumvention grounds, because the concerns the government hypothesizes are already addressed by Bicker's multitude of more direct anti-circumvention measures. How is that? Because Bicker imposes numerous direct circumvention measures. For instance, we have earmarking provisions on earmarking contributions for a particular candidate. We have coordination restrictions on coordinating expenditures with a candidate. There are proliferation restrictions on creating multiple pacts that are all designed to do that. Breyer, All these were there, but for one, were there at the time of Buckley v. Faleo. And I guess the Court thought something could happen like the following. Candidate Smith, you can only give him $2,600, but he has a lot of supporters, and each of them, 40 of them, gets a brainstorm. And each of the 40 puts on the Internet, a little sign that says, Sam Smith PAC. This money goes to people like Sam Smith, great people. Now, we can give each of those 40 $5,000. They aren't coordinated, they're not established by a single person, each is independently run. And we know pretty well that that total of 5,000 times 40 will go to Sam Smith. Okay? What does that violate? There's a couple of problems with that, hypothetically, Your Honor. First of all, there are base limits both on what can be given to a PAC. $5,000. And on what a PAC can give to a candidate. $5,000. So all we have is my $5,000 going to the PAC, and there happen to be 400 PACs. So 5,000 times, oh, 4,000, 5 times 40, 5 times 400, how much is that? I'm too good at math. Without doing the math, I will tell you that earmarking and proliferation respect to the PACs. No, no, there's no earmarking, because earmarking requires that you write on a check or in an accompanying letter that you want the money to go to something. Actually, it does not. Earmarking, the FEC's earmarking regulations are broader than that. If you have a PAC that is going to contribute only to one candidate, you're not going to get more than one contribution. And at that point, then, you don't have the kind of traceability you're talking about, because there's more money coming into the PAC than can find its way to any one particular candidate. I would think if you named a PAC after a particular candidate, as the hypothetical assumes, I would be surprised if the Federal Election Commission wouldn't come after you for earmarking. That's exactly what I'm saying.  Kagan. Well, let's say this one, Ms. Murphy. Let's say this one. You have a hundred PACs, and each of them say that they're going to support the five candidates in the most contested Senate races. There are really only five very contested Senate races. And a hundred PACs say that they're going to support those five candidates. So a donor gives $5,000 to each of those a hundred PACs, which support those candidates. The PAC divides up the money, $1,000 goes to each candidate. The total, all those PACs, $100,000 goes to each of the Senate candidates in the five most contested races, 20 times what the individual contribution limits allow. A couple of responses to that, Your Honor. I mean, first of all, we're talking about scenarios where there isn't coordination at all between the first person who makes the contribution and the candidate later on that's receiving it. So they're not all in his head in a mental Rolodex. But they're not actually donors to him at that point. They're contributing to a PAC that, in your hypothetical, is contributing to multiple different candidates. And I'm not going to go into the details of that, Your Honor, but I'm going to say that the PAC is a donor to five of the most contested Senate races. So a person gives $100,000 to each of five candidates who, if they win, become the five Senators that are most attuned to donors. And he knows who's given him $100,000, each of those five Senators who gets in, on the strength of these contributions that are 20 times what the individual limits allow. I don't think it works to think of these as direct contributions in excess of the base limits, because the PAC is limited itself in how much it can contribute. So you would have to have a role to play. Breyer. What we're trying to do, because it's hard to do an oral argument, but what we're trying to do in both, I think, our cases, is that we looked up all the rules and the regs, or my law clerk did, and what she discovered, and it may be wrong because I'll look at it again, is there has been no significant change in the earmarking rules, in any of the rules that you're talking about, but for one change since Buckley. The one change, the one change, is the change that all contributions made by political committees established by or financed or maintained or controlled by a single person will count as one. So what you're seeing in these hypotheticals is simply the construction of precisely the same situation that existed in Buckley while being careful to have not one person control the 4,000 PACs, which is pretty easy to do. And if you want to say is this a reality, turn on your television set or internet, because we found instances without naming names where it certainly is a reality. Two responses. There are changes in earmarking more than what you've suggested, because the restrictions that the FEC has put out in regulations are, are, they cover more than the statute itself, and specifically they cover these instances of a PAC that is only going to be contributing one candidate, which is where a lot of the concern comes from. Kennedy, I just want to be clear what your answer to Justice Kagan was, her hypothetical. Is part of your answer that this might, that the hypothetical she gives, is not a hypothetical and that it's a fact, that it's a fact, that it's a fact, that it's a fact? Or is that a contravene earmarking, or? That's part of it. It can pose both earmarking concerns and proliferation concerns if we're talking about something. And if we're talking about a PAC, it's a fact. So is part of your answer to her there that the hypothetical isn't real or isn't going to happen, or it's the, or it can't happen under the existing law? Is that your answer? That's part of the answer. I don't think it's a particularly realistic scenario under existing regulations. Is this, is this, would the other side concede that this is true? I, I doubt they would concede that it's true, but, you know, I, I think that if you look at it, if you have a bunch of PACs that are getting contributions from the same group of individuals, you are going to run into earmarking and proliferation restrictions. But the other thing I would say, Your Honor, is that if you have a PAC which says we're going to give money to Smith, that's bad. But if you have a PAC that says we're going to give all the money that you contribute to us to Smith and Jones, that's okay, or Smith, Jones, and three others, it seems to me that that's earmarking. If, if, if, exactly, if the earmarking restrictions, if you know that your contribution Mr. Murphy, if you think it's earmarking to have a PAC that gives money to the five most, the candidates in the five most contested Senate races, I just don't think any FEC would say that that's earmarking. Alito, I don't know if I saw 100 PACs rise up and all of them said exactly the same thing, we're going to make contributions to the five most contested Senate, the candidates in the five most contested Senate races, I would be suspicious. And maybe the FEC would also be suspicious that they didn't just all spring up independently. I think that's absolutely right. I think the FEC would be suspicious. Kennedy. Kennedy. Well, suppose the, suppose that a number of PACs, I forget the number, and Justice Kagan is an example, that we're going to give to congressional and senatorial candidates who, who want to cut down on governmental spending. And we know there's only about four people that are like that. Well. I mean, at that point I think you know, that the one we have a PAC that's not saying to any certainty what they're going to do, then you don't, it's not clear you have something to target there, because the PAC might be spending money in different ways that are not operating as a conduit to, for contra, for circumvention. So, you know, I think that gets again to why this doesn't have the kind of coordination you need. And I do want to. Ms. Murphy, can I give you another one? There are 150 House candidates with completely safe seats, all right? And there are maybe, you know, 30 or 40 or something like that in their party who don't have safe seats. So the 150 gets together, and they say we're going to run a joint fundraiser. And anybody can contribute $2,600 to each of these candidates, 150 of them, right? So that makes about $400,000. And then these 150 candidates with completely safe seats just transfer all this money to the one person who doesn't have a safe seat. So that's about $400,000, double it for a primary and a general election. That's about $800,000. That all goes to one candidate from one donor because of the ability for candidates to transfer money to each other. That is not legal, Justice Kagan. The candidates do not have the ability to transfer money to each other. They only have the ability to transfer a maximum of $2,600 to another candidate per election. A candidate can transfer $2,000 to a candidate per election, and that's a contribution that's a hard contribution limit on how much they can contribute. But I think all of this also gets to another problem, which is there's an overbreath problem here, because if you're talking about this scenario, in your scenario, there's only one person who can even make a contribution. At that point, after the first $2,600 is received. You're exactly right, you're exactly right, Ms. Murphy. One person can make an $800,000 contribution to a house race where $800,000 goes a long way. And then what these 150 candidates can do is they can do it for every single other candidate in a contested seat. So take your 30 or 40 house contested seats and it becomes a conduit for a single person to make a $800,000 contribution to a candidate in a contested district. I think even if you accept this scenario where all of these candidates are independently deciding to give all their money to one candidate, you can't have a law that is designed to prevent this one person from circumvention by prohibiting everybody else from engaging in contributions that don't have any. Ginsburg On everyone else, can you give us an idea of whose expression is at stake? I mean, most people couldn't come even near the limit. So what percentage? Is there any information on what percentage of all contributors are able to contribute over the aggregate? I don't have a percentage on how many are able. I mean, we aren't talking about a large number of individuals. We certainly are talking about more individuals than whose First Amendment rights were implicated by the provision at issue in Davis, for example. I assume that a law that only prohibits the speech of 2 percent of the country is okay. Absolutely not. I mean, whether it affects a few people. Ms. Murphy, we haven't talked yet about the effect of the aggregate limits on the contribution of the maximum amount to as many candidates as they want. The effect of the aggregate limits is to limit someone's contribution of the maximum amount to about 9 candidates, right? That's right. If you're talking about a 9-percent limit. Is there a way to eliminate that aspect while retaining some of the aggregate limits? In other words, is that a necessary consequence of any way you have aggregate limits, or are there alternative ways of enforcing the aggregate limitation that don't have that consequence? Well, it's certainly a necessary consequence of Bikra's scheme in which there's a distinct aggregate limit on contributions to candidates alone. I think, though, that aggregate limits in general are always going to have this effect of prohibiting people from giving contributions that don't themselves give rise to quid pro quo corruption concerns. And that's why, if the government is really concerned about the things it's talking about, there are narrower avenues to get at them. If the concern is joint fundraising committees, you could talk about that. I'm a little confused, okay? I'm confused because we're talking in the abstract. This decision was based on a motion to dismiss. And there is a huge colloquy about what happens and doesn't happen. We don't have a record below. Well, I mean, I can go into the news, as Justice Breyer suggested. It's very hard to think that any candidate doesn't know the contributor who has enough money to give not only to himself or herself, but to any of his or her affiliates who are supporting him or her. I mean, it's nearly common sense, hard to dispute. So you're saying it can't happen, but I don't see charges of coordination going on that much. I guess I'm not sure what you're talking about happening. I mean, if you're just talking about knowing that some individuals are making contributions to other candidates or State parties who are not going to share those contributions with a particular candidate, then I don't see how that gives rise to your circumvention. Breyer, the actual ad, I won't name the candidate. You see a picture of the candidate. There is a sign that says, SmithPak, okay? That's what it says. And then it says, make a donation to help SmithPak support Republican, or you like, or Democratic candidates, period. And then they have an address. All right. Now, it doesn't take a genius to figure out what they're going to do with the money and that maybe Smith will get a pretty good share of it. Now, if Smith has 400 people who figure this out, he will have 400 times 5,000 times one person. Now, you say that really couldn't happen because of the designation. We haven't found a designation rule that would stop it. But then Justice Sotomayor is saying, I don't know and I don't either, because there's been no hearing, there's been no evidence presented, there is nothing but dismissal. Two points, Your Honor. First of all, the case was briefed on cross-motion for injunctive relief. So the government had an opportunity to make a record and it chose to treat this as a legal case, not as one in which we can't do it. Scalia, do we need a record to figure out issues of law? And that's my second point. Really, this is the case. Scalia, I agree, I agree, I agree that this campaign finance law is so intricate that I can't figure it out. It might have been nice to have the, you know, the lower court tell me what the law is, but we don't normally require a record to decide questions of law. And you shouldn't need one here either, because these limits are facially over- and under-inclusive. They're not post-Taylor and you can't. Sotomayor, you're taking a position that the law stops corruption, and you're suggesting that the government is incapable of showing facts that the law doesn't work as it is? I'm suggesting that. Don't you need facts to prove that or disprove that proposition? Even if the government could prove that proposition, there would still be an over- and under-the-problem. If I may, I'd like to reserve the remainder of my time. Thank you, counsel. Mr. Birchfield. Mr. Chief Justice, may it please the Court. Senator McConnell agrees that this aggregate limit does not pass exacting scrutiny. But Senator McConnell believes that all restrictions of this nature should be reviewed under strict scrutiny. To begin with, this is a severe restriction on political speech. It's a severe restriction on political speech. Mr. Birchfield, I'd like you to address this question about the restriction on speech. It has been argued that these limits promote expression, promote democratic participation, because what they require the candidate to do is instead of concentrating fundraising on the super-affluent, the candidate would then have to try to raise money more broadly in the electorate, so that by having these limits, you are promoting democratic participation, then the little people will count some, and you won't have the super-affluent as the speakers that will control the election. Your Honor, I disagree with that for this reason. First of all, this limit, the aggregate limit on political parties, places like-minded political parties in the position of competing against each other rather than collaborating against each other. All the national political parties on the Republican side and the State political parties compete against each other for an artificially limited pool of money from each contributor. The same is true on the candidate side. They compete against each other for the same artificially limited pool of money. Even though each individual contribution to the candidate or to the party is limited by the base limits. The Federal Election Commission regulations, and, Justice Breyer, I would propose that you look at section 110.1h, which specifically prohibits a PAC of the nature you described if a person contributes to a PAC with knowledge his contribution is going to a particular candidate. That is an earmark under the precedence of the Federal Election Commission. Counsel, is it correct that the consequence of this provision has been very severe with respect to national political parties? It is, Your Honor, and particularly in the current environment where the national political parties are being marginalized by outsiders. And much of the money that used to go to them now goes to PACs. Isn't that what has happened? Exactly right. So that this is really, you know, turning the dials on regulating elections. Now, I ask myself, why would members of Congress want to hurt their political parties? And I answer to myself, well, ordinarily, the national political parties will devote their money to elections in those states where the incumbent has a good chance of losing. So in fact, if you're an incumbent, who cares about political parties? I don't want money to go to my opponents. And if you turn down the amount of money that the national political parties have, that's that much less money that can be devoted against you if you're challenged in a close race. Isn't that the consequence of this? Let me see you and raise you one. There are separate limits here, Your Honor, for candidates and for political parties. The effect of this is to insulate the incumbents from competing with the political parties for the dollars. And by imposing a cap on the candidate, on the amount candidates can raise, the incumbents realize that they're the favored class among candidates who are going to be getting the contributions. What a surprise. Has it worked out that way in practice? Has it worked out? Because there was one brief at least saying, no, that that's wrong. In fact, it's the challengers who are aided. Well, Your Honor, I think it is — it is — it is — there's a hard cap on the number any contributor can give to all candidates and a separate cap on the amount that contributor can give to all party candidates. So I read in one summer before BCCRA, I spent several weeks reading the record before the district court in that very lengthy case on this, and it was filled with testimony by Senators and Congressmen that a handful of people can give hundreds of thousands of dollars, they know who those people are, and that those people do have undue influence, which means in First Amendment terms that the individual who in fact has wonderful ideas and convinces others, even by paying 3 cents to buy the Internet or something, hasn't a shot, because it will influence people, not ideas, but the money. Now, there was a record on that. Here there is no record showing whether this aspect does or does not have the same tendency. That is why I ask, how can I decide this on the basis of theory when the record previously showed the contrary of what's been argued and, in fact, at least might show that even in respect to these limits? Well, Your Honor, this case comes to the Court as an as-applied challenge. Mr. McCutcheon does not want to go through, does not want to go through the committees you're talking about. He wants to write checks directly to the candidates and directly to the committees. He is constrained by the aggregate limit. But he can write checks to everyone that he wants to write checks to, it's just he can't give his special number of 1776. If he wanted to give a contribution to every candidate running for a Federal congressional seat, congressional and Senate, he would be limited to $86 or something like that. But I think on his own case it would be something over $1,000, right? Because he identified 12 more candidates that he would like to give 1776. But he could give each of them over $1,000. Your Honor, he could, but again, you're diminishing his right to associate in the intensity of his association by applying this aggregate limit. Ms. Kagan. If you take off the aggregate limits, people will be allowed, if you put together the national committees and all the State committees and all the candidates in the House and the Senate, it comes to over $3.5 million. So I can write checks totaling $3.5 million to the Republican Party committees and all its candidates or to the Democratic Party committees and all its candidates even before I start writing checks to independent PACs. Now, having written a check for $3.5 or so million to a single party's candidates, are you suggesting that that party and the members of that party are not going to owe me anything, that I won't get any special treatment? Because I thought that that was exactly what we said in McConnell, that when we talked about soft money restrictions, we understood that you give $3.5 million, you get a very, very special place at the table. So this is effectively to reintroduce the soft money scheme of McConnell, isn't it? No, no, Your Honor, it is absolutely not, because McConnell dealt with a situation where there were you were not considering the base limits. The soft money, by definition, was not subject to the base limits. To take your example of the Joint Fundraising Committee, the Joint Fundraising Regulation, which consumes more than three pages in the Federal Code of Federal Regulations, it's at 102.17c, it specifically reaffirms the base limits, it specifically reaffirms the anti-earmarking restriction, and it says that the Joint Fundraising Committee must inform all contributors of those restrictions. So, again, it's a situation where the money leaves the contributor's hands, he loses control over it, and the person who received it makes the correction. Kagan. Kagan. Kagan. And indeed, I could make this even worse. I could say, let's say the Speaker of the House or the Majority Leader of the House solicits this money from particular people, so solicits somebody to ante up his $3.6 million, and then, you know, Justice Kennedy said in McConnell, the making of a solicited gift is a quid both to the recipient of the money and to the one who solicits the payment. So the Speaker, the Majority Leader, can solicit $3.6 million to all the party members, and you're telling me there's just no special influence that goes along with that? Well, we know from the Citizens United decision, Your Honor, that gratitude and influence are not considered to be quid pro quo corruption. So I think that's what you're talking about. That is not the sort of corruption that would sustain this limit, especially in light of the severe restrictions on speech and association that it imposes as the political parties compete against each other and as they — and as the candidates have to compete against each other. In Buckley, the Court sustained aggregate limits. What has changed since Buckley? Your Honor, the statute has changed significantly to impose base limits on the parties, to impose on both the State and Federal parties. It has changed to prohibit proliferation of political committees. One of the concerns in Buckley was the dairy industry, which contributed to hundreds of PACs supporting President Nixon's reelection. That is no longer possible. Those were all created by the dairy industry or by the Nixon campaign, is that correct? That's not — as I understand — as I read the lower court decision in Buckley, that is correct. In addition, you also have a thick volume of the Code of Federal Regulations of the Federal Election Commission, which did not exist at the time of Buckley. Thank you, counsel. Thank you, Your Honor. General Verrilli. Mr. Chief Justice, and may it please the Court. Aggregate limits combat corruption. And let me start by explaining exactly how. Aggregate limits combat corruption both by blocking circumvention of individual contribution limits and, equally fundamentally, by serving as a bulwark against a campaign finance system dominated by massive individual contributions, in which the dangers of quid pro quo corruption would be obvious and inherent, and the corrosive appearance of corruption would be overwhelming. Now, the appellants in this case have tried to present the case as though the issue were whether there were some corrupting potential in giving contribution to the 19th candidate after someone has already contributed to the maximum to the 18th. But that's not what this case is about. The appellants are not arguing that the aggregate limit is drawn in the wrong place. They are arguing that there can be no aggregate limit because the base contribution limits do all the work. And so what that means is that you are taking the lid off the aggregate contribution limit, and as Justice Kagan in her question earlier indicated, that means that an individual can contribute every two years up to $3.6 million to candidates for a party, party national committees, and state collections. Roberts' that's because they can transfer the funds among themselves into a particular candidate. Is the possibility of prohibiting those transfers perhaps a way of protecting against that corruption appearance, while at the same time allowing the individual to contribute to however many House candidates he wants to contribute to? I mean, the concern is you have somebody who is very interested, say, in environmental regulation and very interested in gun control. The current system, the way the anti-aggregation system works, is he's got to choose. Is he going to express his belief in environmental regulation by donating to more than nine people there, or is he going to choose the gun control issue? Verrilli, So, Mr. Chief Justice, I want to make two different points in response to that question. The first is that restricting transfers would have a bearing on the circumvention problem, wouldn't eliminate all circumvention risk, but would have a bearing on that problem. But there is a more fundamental problem here. It's a problem analogous to the one that was at issue with Soft Money McConnell, which is the very fact of delivering the $3.6 million check to the – whoever it is, the Speaker of the House, the Senate majority leader, whoever it is who solicits that check. The very fact of delivering that check creates the inherent opportunity for quid pro quo corruption, exactly the kind of risk that the Court identified in Buckley, only apart from where that money goes after it's delivered. What is the framework for analyzing – I agree with you on the aggregation, but it has this consequence with respect to limiting how many candidates an individual can support within the limits that Congress has said don't present any danger of corruption. So what is the framework for analyzing that? I give you your argument with respect to the transfers and the appearance there, but it does have that other consequence on something we've recognized as a significant right. So let me make a specific point about that and then work into the framework. The specific point is this. The aggregate limit would have the effect of restricting the ability of a contributor to make a maximum contribution to more than a certain number of candidates. That's true. We can't help but acknowledge that. It's math. But that doesn't mean that that individual cannot spend as much as the individual wants on independent expenditures to try to advance the interests of those candidates or the interests of the causes that those candidates stand for. Mr. McCutcheon, for example, can spend as much of his considerable fortune as he wants on independent expenditure advocating the election of these candidates. Scalia. And that does not – that does not evoke any gratitude on the part of the people? I mean, if gratitude is corruption, you know, don't those independent expenditures evoke gratitude? And is not the evil of big money, 3.2 million? An individual can give that to an independent PAC and spend it, right? The foundation of this Court's jurisprudence in this area is the careful line that this Court has held repeatedly do not create a sufficient risk of quid pro quo corruption to justify their regulation, and contributions which do. Scalia. But that line eliminates some of the arguments that have been made here, which are arguments against big money in politics. There's – big money can be in politics. And the thing is, you can't give it to the Republican Party or the Democratic Party, but you can start your own PAC. That's perfectly good. I'm not sure that that's a benefit to our political system. Well, I do think we have limits on contributions to political parties in addition to limits on contributions to candidates. And I think that does help establish the point here, which is that candidates are not hermetically sealed off from each other, and parties are not hermetically sealed off from candidates. They're all on the same team. And we limit the amount that an individual can contribute to a political party as well as the amount that an individual can contribute to candidates. Breyer. Actually, it does very much bother – I don't – I'm looking for an answer here. It's not that I have one at all. It is rather basic, the point I think that's being made now. I mean, as I understand it, the whole reason – it is no doubt the campaign limits. Take an ordinary person, and they say you cannot give more than such and such an amount. There are apparently from the Internet 200 people in the United States who would like to give $117,000 or more. We're telling them you can't. You can't support your beliefs. That is a First Amendment negative. But that tends to be justified on the other side by the First Amendment positive, because if the average person thinks that what he says, exercising his First Amendment rights, just can't have an impact through public opinion upon his representative, he says, what is the point of the First Amendment? And that's a First Amendment point. All right. So that's basic, I think. Now, once that's so, Congress has leeway. And you're saying, and I've seen all over the place, but that's why we don't want those 200 people to spend more than $117,000 or $120,000, because the average person thinks the election is after the election, all the actions are affected by the pocketbook and not by the merits of the First Amendment arguments. Okay. And now you say the person can do the same thing anyway, just call it independent. And what independent does, he can spend $40 million. He can spend $50 million. And all that does is sort of mix up the messages, because the parties can't control them. Now, that's, I think, the question that's being asked. And I think that that is a very serious question, and I'd like to know what flows from it. Is it true? So what? What are we supposed to do? What is your opinion about that question? And I have the same question. You have two persons. One person gives an amount to a candidate that's limited. The other takes out ads, uncoordinated, just all on his own, costing $500,000. Don't you think that second person has more access to the candidate who's the candidate is successful than the first? I think that was at the root of Justice Scalia's question and Justice Breyer's. Let me try to answer this with an analogy, if I could, Justice Kennedy. I think the right way to think about it is this. If somebody thinks the Secretary of Defense is doing a great job, they can take out an ad in the Washington Post, spend $500,000 on that ad, saying the Secretary of Defense has done a great job, and they would have an undoubted First Amendment right to do that. No one could think that there's a content — it's hard to imagine a content-neutral justification for prohibiting that speech. But if instead the person wanted to express their symbology — But if Boeing does it, I mean, you know, there's no problem? It would be an independent expression. But if instead somebody wanted to express symbolically their view that the Secretary of Defense has done a great job by giving the Secretary of Defense a Maserati, nobody would think that there was a First Amendment ground that could be invoked — But we're talking here about campaign contributions. Isn't it illegal for a candidate to take campaign contributions and use it to buy a Maserati? We — yes, it is. But the point — Well, then I don't see how that really gets to the point. It gets — I think it does, if I may, Justice Alito, because I think that the point is that the rule against gifts, the conflict of interest rules, they exist to advance a content-neutral government interest of the highest importance.   to say about the district court's opinion is that what I see are wild hypotheticals that are not obviously plausible and lack — certainly lack any empirical support. Now, you've chosen to use the same hypothetical the district court used about the $3.5 million contribution that would be — that could be given by a coordinate which involves all of the House candidates and all of the Senate candidates in a particular year getting together with all of the parties, national party committees, plus all of the State party committees. And then — and that's how you get up to the $3.5 million figure. Isn't that right? Yes. And how realistic is that? How realistic is it that all of the State party committees, for example, are going to get money and they're all going to transfer it to one candidate? For 49 of them, it's going to be a candidate who is not in their own State. And there are virtually no instances of State party committees contributing to candidates from another State. And the other part of it that seems dubious on its face is that all of the party — all of the candidates for the House and the Senate of a particular party are going to get together and they are going to transfer money to one candidate. They're really — you cited in your brief the best examples, I take it, of contributions from some candidates to other candidates. They are very small. Isn't that true? Yes. But I think there are two, Justice Alito. I think that with all due respect, I think the point Your Honor is making confuses two different ways in which these laws combat the risk of corruption. The first one is that the handing over of the large check, and whether it's a $3.6 million check for everyone or a $2.2 million check for the House candidates or a $1 million check for all the State committees, the very — just as the Court found in McConnell with respect to massive soft money contributions and the inherent risks of corruption there, there's an inherent risk of corruption. And that's why, indeed, as I said, we have limits on how much we contribute to a political party for that reason. And that's apart from how it gets transferred. Unless the money is transferred to — you have to get it from the person who wants to corrupt to the person who is going to be corrupted. And unless the money can make it from A to B, I don't see where the quid pro quo argument is. Well, I think that the — I think that the way these joint fundraising committees work is you hand over a single check to a candidate who solicits it. And it could be any candidate who sets up a joint fundraising committee, says give to me and give to the rest of my team. And that — so the handing over the check to that candidate is a — seems to me it creates a significant risk of indebtedness on the part of that candidate, even though a lot of the money is flowing through to others. In addition, the party leaders are often going to be the ones who solicit those contributions, and they are going to have a particular indebtedness to candidates, because, of course, their power, their authority depends on the party retaining or gaining a majority in the legislature. And so they are going to feel a particular sense of indebtedness that this person is helping not only them, but everybody in massive amounts. I understand. And then — I'm sorry, you — If I may just make my third point, Mr. Chief Justice. And the third point, I think, is that every — every candidate in the party is going to be affected by this, because every candidate is going to get a slice of the money, and every candidate is going to know that this person who wrote the multimillion dollar check has helped not only the candidate, but the whole team, and that creates a particular sense of indebtedness. And, of course, every member of the party is likely to be — every officeholder in the party is likely to be leaned on by the party leadership to deliver legislation to the people who are buttering their bread. And these — these aggregate limits might not all stand or fall together. But just take this example, if you can just take a minute and walk me through this step by step. You have somebody who wants to corrupt a member of the House, and this person's strategy is to make contributions to multiple House candidates with the — the hope, the expectation, the plan that those candidates are going to transfer them, transfer the money to the — the member that this person wants to corrupt. Now, how is that person going to accomplish that, given the earmarking regulations and — and — and the limits on how much one member can contribute to another? So, you know, I think that that — I think it's possible, but I think if somebody had that goal, that circumvention goal, by far better ways of achieving it would be giving significant — and you've taken the aggregate caps off — would be making significant contributions to State parties and national parties who are free to transfer money among themselves without restriction, and by — and by making contributions to PACs. Alito, I mean, if you're not going to defend the application of the aggregate limits in that situation, doesn't it follow that as applied to that situation, these are — these are unconstitutional? Verrilli, No, I don't think so. I think it — I think it — I think it — first of all, I think it could happen in that situation, but I think it's more likely to happen in both. Alito, Well, then just explain to me how it's going to be done. If the person gives to member A with the hope that member A is going to give it to member B, if the person even implies, when making the contribution to A, that the person wants it to go to B, that's earmarked. So how is this going to be done? Verrilli, I think — in McConnell and in Colorado Republican II, this Court said that earmarking is not the outer limit of the government's authority to regulate here. And the reason the Court said that is because a lot of this can be done with winks and nods and subtly. And so I don't think it's the case that earmarking would work to prohibit that. But I also think that the — when we're talking about aggregate limits, they're part of an overall system of regulation, and I think that they work to keep the — to keep the circumvention risk in check, and they work to make sure that you don't have the kind of problem that you identified. Breyer. So what would you think? Because just listening to your dialogue, and you heard — this is pretty tough. We try to construct some hypotheticals, and the counsel says, no, I've got a problem and I've got this part wrong or that part wrong or the other one, and they may be right. And we can't do this, figuring out all these factual things, in an hour, frankly. And they may be right. I'm not sure. There hasn't been a full hearing. It seemed to me there are things to explore in respect to the circumvention. Who is right? Should you change the hypothetical slightly or what? There are things to explore in respect to the question of whether being able to write a $3.6 million check to a lot of people does lead the average person to think my First Amendment speech, in terms of influencing my representative, means nothing. There are things to explore in terms of the relationship between what is permissible, namely spend $40 million independently, and what isn't permissible, namely spending more than $117,000. None of these have been considered. They would seem relevant. So what do you think about going into these matters in a district court where the evidentiary aspects of them can be explored at some length? Verrilli, I think, Justice Breyer, that the statute can be upheld under the current state of the record. I understand and I take Your Honor's point, but I do think that you had a substantial record in Buckley, you had a substantial record in McConnell, but that substantial record bears directly on the question of whether massive aggregate contributions pose the inherent danger of corruption and the corrosive appearance of corruption, and that the case can be decided on that basis. Ginsburg, the government in the proceeding below didn't suggest in response to the proceedings before the three-judge court that an evidentiary hearing was – both sides seemed to treat this as a matter that could be disposed of without an evidentiary hearing. Is that right? That's correct, Your Honor. There's the point that the Chief made about what this does, these limits particularly on the national taxes, it drives contributions toward the PACs and away from the parties. The money – without these limits, the money would flow to the candidate, to the party organization, but now instead it's going to the PACs. What is your response to that? Well, we take the constitutional First Amendment framework of this Court's decisions as a given. The Court has determined that independent expenditures do not present a risk of quid pro quo corruption. That allows their regulation. That contributions, direct contributions to candidates and to parties can pose that risk and therefore can be regulated. Fine. I mean, that's the law, but the question says, what the question is directed at, given that that's the law, isn't the consequence of this particular provision to sap the vitality of political parties and to encourage, what should I say, you know, drive-by PACs for each election? Isn't that the consequence? So I think the answer is we don't know one way or another whether that's the consequence I think we Well, I don't – with all due respect, Justice Scalia, I don't think we know. The parties still raise and spend very substantial amounts of money, and so I don't think that we know, but beyond that, Congress has made a determination that there is a real risk of quid pro quo corruption and the appearance of quid pro quo corruption here and has regulated with respect to that risk, and Congress is, of course, free to take this into consideration. Scalia, you say it's $3.5 million. If you assume somebody that gives the maximum to every possible candidate and party he can contribute to throughout the United States, $3.5 million, just to put that in perspective, how much money is spent by political parties and PACs in all elections throughout the country, in one election cycle? I think that's a good point, Justice Scalia. I think it helps to illustrate your point, too. Take the 2010 elections, non-presidential year. Each party spent – parties and candidates together on each side spent approximately $1.5 billion. $1.5 billion, and what about PACs? That I don't have the specifics for, but the parties Oh, but that was a lot in the last few elections. But the parties – but here's the problem. And what about newspapers that spend a lot of money in endorsing candidates and promoting their candidacy? I suppose, you know, you have to put in that money, too. So that is money that is directed to political speech. When you add all that up, I don't think $3.5 million is a heck of a lot of money spread throughout the country. I don't think that's the right way to look at it, Your Honor. If you think that a party's got to get $1.5 billion together to run a congressional campaign, parties and candidates together, and you've got a maximum of $3.6 million, that is about 450 people you need to round up. Less than 500 people can fund the whole shoot-and-match. And that, I think, is part of the problem here, is that you're going to create a situation if you take off the aggregate limits in which there's a very real risk that both that the government will be run of, by, and for those 500 people, and that the public will perceive that the government is being run of, by, and for those 500 people, and that is why we have these aggregate limits and why they need to remain in place. Roberts, the consequence is, just to get back to my prior question, the consequence is you're telling somebody who doesn't want to give $3.4 million, but wants to contribute to more than nine House candidates, just up to the maximum, which, you know, the 5,000 per the double cycle, you're telling him that he can't make that contribution, however modest, certainly within the limits Congress has said does not present a problem of corruption, to a tenth candidate. I appreciate the argument you're making about the 3-point-whatever-million-dollar check and the need for the aggregate limits to address that. I understand that point. But what do you do with the flip side? I mean, you can't pretend that that is pursued with no First Amendment cost, quite apart from the one that's there. It seems to me a very direct restriction on much smaller contributions that Congress said do not present a problem of corruption. Verrilli, I take that point, Mr. Chief Justice. But I think the right — you asked earlier about the right analytical framework. I think the right analytical framework under the First Amendment is to think about this in terms of content neutrality. The government's interest in preventing corruption and the appearance of corruption, which is why I brought up the example of the Maserati to the Secretary of Defense, is an entirely content-neutral justification. Roberts. Roberts. Well, but that wouldn't — doesn't normally get you very far in the First Amendment. I mean, you could not have a rule that says the Post or the New York Times can only endorse nine candidates. Because, I mean, it's completely content-neutral. You don't care who the tenth is. But that limit would not be. Verrilli, I would think that would be a content-based justification because you're not trying to prevent corruption or the appearance of corruption by doing that, and there's no other neutral justification that I can think of for why you would impose such a rule. But the point is, with respect to elected officials and the giving of money to the elected officials, there is this content-neutral justification that just doesn't exist with respect to any other entity out there in the world. And, yes, it's not free of First Amendment cost, and we acknowledge that, but that cost is mitigated, and this is not a prohibition that you can't make it at the maximum, but you can make less at any level. Roberts. Is there any way to prevent the concern you have about the three-point, whatever it is, million-dollar check, without imposing the limit on the person who wants to support ten candidates rather than nine? Well, I suppose you could try to calculate an aggregate contribution limit that's different and higher than the one that's here now. But the problem with that is that the appellants aren't making that argument. They're making the argument that you cannot have the only argument they've made in this case is that you cannot have aggregate limits because base contribution limits do all the work. They're making the argument that there are the regulations that already exist about transfers from one entity to another prevent a lot of what you're complaining about, what you are worried about. But if they're not sufficient, they could be bolstered. The aggregate limits are a very blunt way of trying to get out, get at the problem that you're, that you're worried about. That's their argument. What are the other? Is that wrong? There's nothing more that could be done to prevent transfers from joint fundraising committees or from one member to another or from State parties to candidates. So, again, I apologize for repeating myself, Justice Alito, but circumvention is not the only problem. The delivery of the solicitation and receipt of these very large checks is a problem, a direct corruption problem, and none of the alternatives that the appellants have identified address that problem. I just don't understand that. You mean at the time when the person sends the money to this hypothetical joint fundraising committee, there's a corruption problem immediately, even though what if they just took the money and they burned it? There would be a corruption problem there? Well, they're not going to burn it. Well, all right. And that's the point. They're not going to burn it because they need it. When does the corruption occur? It occurs when it's transferred to the person who has power and they want to corrupt. I beg to differ, Your Honor. I think what it does is create the sense of indebtedness on the part of the recipient and on the part of the party leadership when it's delivered. And that's the inherent risk of corruption in that situation. It's quite parallel to McConnell. It's why we have aggregate limits on what you can give to a party, because these people are not hermetically sealed off from each other. They're all on the same team. They all have an interest in each other's success. And so party leaders in particular are going to feel a sense of indebtedness. And their less restrictive alternatives don't deal with that. But now going to — if I could, I'll try to address the circumvention problem. You know, they — what they've done is come up with a whole series of things that you would have to — there's not one thing that you would have to do to take care of this problem. You'd have to say no transfers. You'd have to say segregated accounts. You'd have to say no giving money to PACs who have indicated that they're going to give money to candidates once you've already given money. You're going to have to do five or six things to deal with the risk of corruption. The idea that that's a less restrictive means, it seems to me, like a significantly more restrictive means. And it's going to impose First Amendment costs of its own. I'm sure the PACs are going to say, what do you mean we can't say who we want to give money to? We have a First Amendment right over there. Scalia. It seems to me — it seems to me fanciful to think that the sense of gratitude that an individual senator or congressman is going to feel because of a substantial contribution to the Republican National Committee or Democratic National Committee is any greater than the sense of gratitude that that senator or congressman will feel to a PAC, which is spending enormous amount of money in his district or in his state for his election. I mean, it seems to me the latter is much more identifiable, and there is nothing in the law that excludes that. So apparently that's not too much of a risk. Verrilli, Jr. Well, Justice Scalia, I'm not here to debate the question of whether the Court's jurisprudence is correct with respect to the risks of corruption from independent expenditures. It is what it is. But we accept it. And the line is that there is, on this Court's jurisprudence, that there is an unacceptable risk when contributions are too high. And if I may just say this in conclusion. Kennedy, Jr. So your answer to the questions that have been put previously from me and Justice Breyer and Justice Scalia is, that's the law? Verrilli, Jr. Well, that's the law. Kennedy, Jr. Just to be fair, I'm coming off the bench with the understanding that your answer is Buckley has settled that issue. No more discussion necessary. Verrilli, Jr. The risk – we think the risk of corruption is real. And we think it's, in fact, profound when you're talking about the kinds of contributions that can be made if you take the lid off on aggregate contributions. If Justice Scalia's critique of the situation proves correct and it is deeply disabling to candidates and parties, Congress can address that by changing the contribution limits. In general, I suppose that if this Court is having second thoughts about its rulings that independent expenditures are not corrupting, we could change that part of the law. And far be it from me to suggest that you don't. Or is it, if it's interrelated? The record, as far as I recall it from several years ago, talked about at length I don't like to use the word corrupting. I like to use it, integrity of the process, the notion to get people to think that their First Amendment speech makes a difference, et cetera. But say corruption. It was not mostly when it got to this part of the aggregate. It was about circumvention. And I think you're quite right to say, but there's a huge corruption aspect to this. But we don't have a lot of information in the record about that, do we? Did I just miss it? Well, I think with respect to McConnell, this is the real, it's really a very close parallel. It is a close parallel. When I think about it, maybe you think about it, but if you're really talking, they don't think about it that way. And so that's why I've been pushing this idea, you see, of let's go into this, okay? They want us to go into it, go into it. May I answer? Sure. I understand that, Your Honor. I would say that I think the record, after all, these aggregate limits were enacted in BICRA, the same statute to which that legislative record pertains, and it really does go to the same problem. And therefore, I think it bears upon it, and it's ample evidence that would justify upholding these aggregate limits, and I would strongly urge the Court to do so. Thank you. Thank you, General. Ms. Murphy, you have three minutes remaining. Thank you, Mr. Chief Justice. Just a few quick points. First, we haven't heard the Solicitor General talk that much about circumvention today, and I think that's because the circumvention argument just doesn't really work. It's already addressed by all of the multiple prophylactic measures that BICRA contains. And to the extent those aren't sufficient, there are much narrower, tailored ways to get at this, as the questions from Justice Alito and the Chief Justice pointed out. So what we're really hearing today is a corruption argument, but as the questioning revealed, once you accept the corruption theory that the government is putting forward here, there really isn't a way to continue to draw a line between independent expenditures and the $3. million check to all of these different individuals that is in small, base-limited amounts, because there's certainly going to be just as much gratitude to the individual who spends $3. 6 million directly supporting one candidate through ads on that candidate's behalf. So what we really have is a system that's forcing money out of the most transparent way possible to make contributions, which is directly to the candidates and the parties and the PACs. If there's no further questions, thank you. Roberts. Thank you, counsel. The case is submitted.